Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, except for certain technical modifications, the Full Commission AFFIRMS and ADOPTS the MODIFIED Opinion and Award of the former Deputy Commissioner as follows:
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the former Deputy Commissioner, as
STIPULATIONS
1. That all parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction over the parties and this claim, and this claim is subject to the Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and plaintiff-employee at the time of the alleged injury.
3. That the defendant was self-insured and that Compsource was the administrator of its plan.
4. That the plaintiff's average weekly wage at the time of the alleged occupational disease will be determined from the Form 22 that shall be submitted by the defendant.
* * * * * * * * * * *
Based upon all of the competent evidence adduced at the hearing and from the record, the Full Commission makes the following
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 42 years old and had completed the seventh grade. Plaintiff had started to work to obtain her GED but did not complete the same but could read the newspaper.
2. Prior to coming to work for defendant, plaintiff had worked for K-mart as a stocker, she had worked for Nanco taking automobile parts off machines and she had worked for Thomas Howard picking up orders for various companies.
3. Plaintiff first began working for defendant in March of 1992. Plaintiff worked basically at two positions while she was employed by defendant. Those positions were that of dacron picker and cushion inspector.
4. Plaintiff worked as a dacron picker from March 16, 1992 through November 4, 1992. Thereafter, plaintiff stopped working for defendant for a short period of time.
5. Plaintiff returned to work for defendant in January 1993 as a cushion inspector.
6. The job of inspector required plaintiff to pull from 75 to 300 cushions per day, normally she would pull between 200 and 250 cushions to inspect daily.
7. When plaintiff inspected the cushions, she was checking to ensure that the cushions did not have any loose fibers on the edges or sides, that the corners stood correctly and that there were not any holes that needed to be repaired. If there were loose fibers on the cushion, plaintiff would use scissors to cut the excess fiber from the cushion. If the corners did not stand or lie correctly, plaintiff would use an ice pick to either smooth the material within the cushion out or to straighten the corners of the cushion. If the cushion had any holes in it, plaintiff would repair it with a needle and thread.
8. Defendant changed the administrator of its coverage on March 1, 1993 from Consolidated Administrators to Compsource.
9. Plaintiff first began to experience problems with her hands in February, 1993, while she was working as an inspector.
10. The problems that plaintiff experienced included nocturnal pain in her hands and wrists with the pain radiating up to her elbows and sometimes to her shoulders, swelling and prominent numbness, stiffness of her wrists and her hands going to sleep.
11. On April 14, 1993, plaintiff went to see Dr. D. Dennis Payne concerning her hands. Dr. Payne examined plaintiff and determined that she was suffering from bilateral carpal tunnel syndrome. Dr. Payne's course of treatment included the wearing of splints on both hands twenty-four hours per day and medication to control the pain and swelling.
12. When plaintiff failed to respond to the conservative therapy, Dr. Payne made arrangements for plaintiff to see Dr. Mark McGinnis for consideration of carpal tunnel release.
13. Dr. McGinnis treated plaintiff with further conservative methods and when she did not respond, he made arrangements for her to be seen and treated by Dr. E. Brown Crosby. Dr. Crosby is an orthopedic surgeon who concentrates in the treatment of the hand and upper extremity.
14. Dr. Crosby found plaintiff to be suffering from bilateral carpal tunnel syndrome and bilateral de Quervain's disease with it being worse on the left than the right.
15. On June 23, 1993, Dr. Crosby performed release surgery on plaintiff's left hand, and a month later he performed release surgery on her right hand.
16. As a result of plaintiff's job as an inspector, plaintiff was at an increased risk of sustaining bilateral carpal tunnel syndrome and bilateral de Quervain's disease than the general public.
17. Plaintiff's bilateral carpal tunnel syndrome and bilateral de Quervain's disease was a direct result of the repetitive motion required by plaintiff's position as an inspector.
18. Dr. Naso is an expert in the field of hand surgery and he does extensive work in the area of occupational injuries.
19. Although the job of inspector did not require the extensive use of the left hand, once the plaintiff started to experience the problems in her right hand she compensated by increasing the use of her left hand and did things that she would have normally done with her right hand with her left hand. This increased use of her left hand caused plaintiff to develop bilateral carpal tunnel syndrome.
20. After her operations, as a result of her bilateral carpal tunnel syndrome and bilateral de Quervain's disease, plaintiff was out of work and incapable of earning wages with defendant-employer or in any other employment from June 23, 1993 through October 26, 1993; and from March 29, 1994 through July 17, 1994.
21. On November 3, 1993, plaintiff reached maximum medical improvement. As a result of plaintiff's contraction of bilateral carpal tunnel syndrome, plaintiff was incapable of returning to the type of work that she had performed prior to her surgery. In addition, plaintiff had restrictions of lifting only ten pounds occasionally, and restrictions of avoiding repetitive lifting of any weight.
22. As a result of plaintiff's contraction of bilateral carpal tunnel syndrome and bilateral de Quervain's disease, plaintiff has a permanent partial disability of five percent in her right hand and ten percent in her left hand.
23. Defendant did not have any positions available to offer plaintiff that fell within her limitations.
24. Plaintiff, on her own and with the assistance of Vocational Rehabilitation, attempted to locate work that was within her limitations but she has been unable to locate any positions.
25. Plaintiff did not have any medical problems with her hands prior to contracting bilateral carpal tunnel syndrome and bilateral de Quervain's disease.
26. Plaintiff's average weekly wage at the time of her disablement was $236.35.
* * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. As a result of the work assigned by defendant-employer, plaintiff has contracted bilateral carpal tunnel syndrome and bilateral de Quervain's disease. Such diseases were contracted due to causes and conditions which are characteristic of and peculiar to plaintiff's employment, are not ordinary diseases of life to which the general public is equally exposed, and are, therefore, occupational diseases. G.S. § 97-53 (13).
2. Plaintiff's last injurious exposure to the hazards of bilateral carpal tunnel syndrome and bilateral de Quervain's disease occurred after defendant changed the administrator of its coverage on March 1, 1993 from Consolidated Administrators to Compsource. G.S. § 97-57.
3. As a result of plaintiff's contraction of her occupational diseases, plaintiff is entitled to temporary total disability compensation in the amount of $157.57 per week from June 23, 1993 through October 26, 1993; and for the period from March 29, 1994 through July 17, 1994. In addition, plaintiff's period of temporary total disability shall continue until further order of the Industrial Commission. G.S. § 97-29.
4. Plaintiff's average weekly wage at the time she sustained her occupational diseases was $236.35, yielding a compensation rate of $157.57. G.S. § 97-2 (5).
5. Plaintiff is entitled to payment of all medical expenses incurred, or to be incurred, as a result of her contraction of her occupational diseases. G.S. § 97-59.
* * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Subject to counsel fees hereinafter approved, defendant shall pay to plaintiff compensation benefits at the rate of $157.57 per week for the period from June 23, 1993 through October 26, 1993; and from March 29, 1994 through July 17, 1994 and forward until such time as plaintiff is no longer disabled and has returned to work or until further order from the Industrial Commission. As much of said amount as has accrued, payment shall be made in a lump sum.
2. A reasonable attorney fee in the amount of twenty-five percent of the compensation approved and awarded for the plaintiff is approved and allowed for plaintiff's counsel. The attorney's fee shall be deducted from the compensation payable to plaintiff and shall be paid directly to plaintiff's attorney.
3. Defendant shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of the occupational diseases she sustained. Payment shall be made after defendant have submitted bills for said medical services to the Industrial Commission and said bills have been approved by the Industrial Commission.
4. Defendant shall pay the costs.
IT IS FURTHERMORE ORDERED that this case be REMOVED from the Newton hearing docket.
 S/ _______________________ SCOTT M. TAYLOR DEPUTY COMMISSIONER
CONCURRING:
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
S/ _______________________ LAURA K. MAVRETIC COMMISSIONER
SMT/bb 4/25/96